# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

THE PREMISES KNOWN AND DESCRIBED AS 518 TIMPSON PLACE, BRONX, NY 10455 AND ALL LOCKED AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN

)
)
)
)
)
)

Case No. **12 MAG 1643**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

THE PREMISES KNOWN AND DESCRIBED AS 518 TIMPSON PLACE, BRONX, NY 10455 AND ALL LOCKED AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

PLEASE SEE ATTACHED AFFIDAVIT AND ATTACHMENT A.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | NARCOTICS OFFENSES; MANUFACTURE AND DISTRIBUTION OF CONTROLLED SUBSTANCE AND POSSESSION WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE; CONSPIRACY |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James C. Krause, HSI, ICE
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 06/19/2012 _____

_____
*Judge's signature*

City and state: New York, New York

Honorable Andrew J. Peck, USMJ
*Printed name and title*

000008244

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION   :
OF THE UNITED STATES FOR A SEARCH       **TO BE FILED UNDER SEAL**
WARRANT FOR THE PREMISES KNOWN   :
AND DESCRIBED AS 518 TIMPSON       **AFFIDAVIT IN SUPPORT OF AN**
PLACE, BRONX, NY 10455 AND ALL   :   **APPLICATION FOR A SEARCH**
LOCKED AND CLOSED CONTAINERS AND      **WARRANT**
CLOSED ITEMS CONTAINED THEREIN   :

  :

- - - - - - - - - - - - - - - x

STATE OF NEW YORK      )
COUNTY OF NEW YORK     )   ss.:
SOUTHERN DISTRICT OF NEW YORK )

     JAMES C. KRAUSE, a Special Agent with the United States

Department of Homeland Security, Homeland Security Investigations

("HSI"), being duly sworn, deposes and states:

     1.   Upon information and belief, there is probable cause to

believe that there is evidence inside the premises known and

described as 518 Timpson Place, Bronx, New York, 10455 and inside

the locked and closed containers and closed items contained

therein (the "SUBJECT PREMISES"), of violations of Title 21,

United States Code, Sections 841 and 846, and other laws. The

sources of my information and the grounds for my belief are set

forth below.

INTRODUCTION

     2.   I am a "federal law enforcement officer" within the

meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal

Procedure, that is, a government agent engaged in enforcing the

criminal laws and duly authorized by the Attorney General to

000008245

request a search warrant. I have been a Special Agent for approximately 5 years. During that time, I have participated in investigations of narcotics trafficking and other offenses. I have participated in approximately four narcotics search warrants. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are produced, transported, stored, distributed, including the operations of places where marijuana plants are cultivated and harvested ("Grow Houses"), and the methods of payment for such drugs.

3. I have personally participated in the investigation of this matter. This affidavit is based upon my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the SUBJECT PREMISES, I have not included herein the details of every aspect of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## THE SUBJECT PREMISES

4. Law enforcement agents have personally observed the

-2-

000008246

area near and around the SUBJECT PREMISES. The SUBJECT PREMISES is a single story warehouse structure located at 518 Timpson Place, Bronx, New York. The front of the building has two large roll up gates in the center and doors on both sides of those gates.

## PROBABLE CAUSE

5. As described in greater detail below, the investigation into the SUBJECT PREMISES began after an individual named FRANCIS HIDALGO was arrested in this district and a consent search was conducted at HIDALGO's residence. Documents recovered from that search led investigators to a warehouse in the Bronx, at which HIDALGO had operated a marijuana grow house. Other documents recovered from HIDALGO's residence during the consent search listed the SUBJECT PREMISES as a location to which supplies were delivered and suggested that the SUBJECT PREMISES may be another marijuana grow house. In addition, as described below, physical surveillance of the SUBJECT PREMISES and video taken by a pole camera has revealed, among other things, that: (i) equipment and supplies consistent with the operation of a marijuana grow house have recently been delivered to the SUBJECT PREMISES; and (2) an individual whom I believe, based upon judicially approved wire interceptions of HIDALGO's phone, to be associated with HIDALGO's marijuana cultivation activities, has visited the SUBJECT PREMISES. Moreover, utility records show that gas usage for the

-3-

000008247

SUBJECT PREMISES jumped substantially after a new utility customer began paying for gas at the SUBJECT PREMISES beginning in January 2012.

6. On January 12, 2012, I and other law enforcement agents arrested an individual named FRANCIS HIDALGO who had been charged in a criminal complaint in this district, signed by Magistrate Judge Henry B. Pitman, with participating in a fraud and identity theft conspiracy.[1] See United States v. Phillip Smith et al., 12 Mag. 47. On the day of his arrest, HIDALGO consented to a search of his residence. This search revealed, among other things, (1) $54,000 in cash; (2) receipts from several stores in the New York Metropolitan area specializing in hydroponic supplies; (3) a customer's deposit receipt from Consolidated Edison Corp. indicating that, on December 13, 2010, $240 had been deposited into a Consolidated Edison account, in the name "Francis Hidalgo," for the address 343 Concord Avenue, Bronx, New York; (4) two invoices, dated October 18 and 24, 2011, from "Feldman Lumber" listing, in the "Ship To" field, the name "frank" with address "518 Timpson Place, Bronx," the address of the SUBJECT PREMISES; and (5) a "contract adjustment" document for the rental of a jack hammer from "Bronx Tool Repair Corp." listing the

---

[1] On February 9, 2012, HIDALGO and other members of the conspiracy were indicted in this district for conspiracy to commit access device fraud, conspiracy to produce false identification documents, and aggravated identity theft. See United States v. Phillip Smith et al., 12 Cr. 133 (JFK).

-4-

000008248

renter as an individual named "Vernon Snell."

7.   From a leasing agent (the "Leasing Agent") for the location of 343 Concord Avenue, Bronx, New York, which is a warehouse (the "Concord Avenue Warehouse"), I have learned that FRANCIS HIDALGO, using his real name and home address, signed a three-year lease for the Concord Avenue Warehouse beginning October 1, 2010, but abruptly cancelled the lease in mid to late January 2012, shortly after his release on bail in this district. I also know from the Leasing Agent that the rent for the Concord Avenue Warehouse was approximately $3500 per month.

8.   In late January 2012 and early February 2012, I and other law enforcement officers, including a New York State Police Investigator who teaches law enforcement classes regarding the identification of marijuana grow rooms, together with the Leasing Agent, visited the Concord Avenue Warehouse. Based upon my observations at the Concord Avenue Warehouse, I believe that the Concord Avenue Warehouse had recently been used for a marijuana growing operation. These observations include: (1) a strong odor of marijuana; (2) a pulley system consistent with use in high intensity discharge lamps which provide the imitation light and heat needed for plants to grow; (3) evidence of a ventilation system typical of marijuana grow rooms, including fans and air vents; (4) large patches of black mold on the ceiling and walls typical of the results of marijuana cultivation; and (5) a series

-5-

000008249

of recently built rooms – constructed with wood – consistent with the cultivation of plants in various stages of growth. Samples taken from the Concord Avenue Warehouse subsequently tested positive for Tetrahydrocannabinol ("THC"), the principal psychoactive constituent of the cannabis plant.

9. Based upon my knowledge and experience, I know that wood of the kind and in the quantity listed on the "Feldman Lumber" invoices found in FRANCIS HIDALGO's residence, which invoices indicate that the wood was shipped to the SUBJECT PREMISES, is similar to the wood that had been used at the Concord Avenue Warehouse to build a structure for the purpose of operating a marijuana Grow House.

10. From an investigator with the Office of the New York State Attorney General's Office (the "Investigator") who conducted surveillance of the SUBJECT PREMISES, I know, among other things, that on June 15, 2012, at approximately 11:48 a.m., an individual drove up to the SUBJECT PREMISES and taped a notice on both doors of the SUBJECT PREMISES. The notice was addressed to "Francis Hidalgo" and "Dennis Calderon," and indicated that rent was owed in the amount of $7,500.

11. I and other law enforcement officers have conducted surveillance of the SUBJECT PREMISES – which address was listed as the "Ship To" address on the "Feldman Lumber" invoices recovered from HIDALGO's residence. I have also reviewed

-6-

000008250

photograph still images and videos obtained from a pole camera directed toward the front of the SUBJECT PREMISES.

12.   I have reviewed photographs obtained through the use of a pole camera directed toward the front exterior of the SUBJECT PREMISES.   Photographs of the front of the SUBJECT PREMISES taken on May 24, 2012 at approximately 3:23 p.m. and May 25, 2012 at approximately 5:10 p.m. each depict a man either delivering or removing what appears to be watering hoses to the SUBJECT PREMISES.   Another photograph, taken on May 24, 2012 at approximately 3:23 p.m., depicts a man delivering what appears to be long lighting strips to the SUBJECT PREMISES.   Another photograph, taken on June 4, 2012 at approximately 12:11 p.m. depicts a man delivering or removing what appears to be a lighting ballast, a device intended to limit the amount of current in an electric circuit, to the SUBJECT PREMISES.   Another photograph, taken on May 25, 2012 at approximately 4:10 p.m. depicts a man approaching or leaving the SUBJECT PREMISES with what appears to be a large black bag.

13.   Based upon my knowledge, training, and experience, I believe that the items described above - including watering hoses, lighting strips, and ballasts - are consistent with items used for indoor plant cultivation, including Grow House operations.

14.   I have reviewed video footage taken on June 3, 2012 at

-7-

000008251

approximately 4:30 p.m. in the area near the front of the SUBJECT PREMISES depicting the following. One car ("Vehicle-1") arrives and parks across the street and at a short distance down the block from the SUBJECT PREMISES. Moments later, a man emerges from the passenger side of a different vehicle nearly in front of the SUBJECT PREMISES ("Vehicle-2") and approaches the front driver's side of Vehicle-1. A man emerges from the front driver's side of Vehicle-1 and hands the man from Vehicle-2 what appears to be a large black bag. Vehicle-2 pulls out of its spot and backs up in the direction of Vehicle-1, and the individual who had gotten out of Vehicle-2 gets back into the passenger's side of Vehicle-2 with the large black bag. Vehicle-2 pulls into a spot near the front of the SUBJECT PREMISES while Vehicle-1 pulls out of its spot and parks a short distance further down the block. A short time later, a man emerges from the driver's seat of Vehicle-2, retrieves a large black bag from the rear seat of Vehicle-2, looks around suspiciously, and places the large black bag into the trunk of Vehicle-2. Shortly thereafter, Vehicle-1 drives away.

15. Based upon my knowledge, training, and experience, I believe that the unusual circumstances of the transfer of the large black bag described in the preceding paragraph is consistent with counter-surveillance techniques and cautions typical of a transfer of narcotics.

-8-

000008252

16. I have reviewed a photograph taken of the area in front of the SUBJECT PREMISES on June 11, 2012 at approximately 10:16 a.m., which depicts an individual walking nearby the front of the SUBJECT PREMISES ("Individual-1"). Based upon a comparison of the photograph of Individual-1 near the front of the SUBJECT PREMISES and a photograph contained in the criminal record of VERNON SNELL, I believe that Individual-1 is SNELL. From my review of SNELL's criminal history, I know that SNELL was convicted, on or about December 9, 2008, in Westchester County Court for Criminal Possession of Marijuana in the Second Degree. This conviction resulted after the Yonkers Police Department executed a search warrant and discovered a marijuana grow house containing approximately 100 pounds of marijuana. I also know that the name "Vernon Snell" appears as the renter on a "contract adjustment" document for the rental of a jack hammer from "Bronx Tool Repair Corp." that was recovered during the search of FRANCIS HIDALGO's residence.

17. During the course of the investigation into FRANCIS HIDALGO's participation in a fraud and identity theft conspiracy, law enforcement conducted judicially authorized monitoring of HIDALGO's cellular telephone. Among the intercepted calls are calls between HIDALGO and an individual referred to in other

-9-

000008253

calls as "Benson," whom I believe to be VERNON SNELL,[2] regarding what I believe to be a rental payment for a location of a marijuana grow house and equipment and improvements needed to operate a marijuana grow house. The following paragraphs briefly describe some of these calls:

       i.  On August 4, 2011 at approximately 1:26 p.m., FRANCIS HIDALGO called a landlord for the Concord Avenue Warehouse and asked, in substance, whether HIDALGO's "partner" has called the landlord regarding the rent money. HIDALGO then tells the unknown individual that he, HIDALGO, is out of town and had left his partner the rent money and that he, HIDALGO, will call HIDALGO's partner to find out where he is with the rent money. Just one minute later, at 1:27 p.m., HIDALGO called "Benson" and told "Benson," in substance, and among other things,

_____

[2] Among the reasons I believe that the individual referred to as "Benson" on the intercepted calls is VERNON SNELL are the following: (1) In a call on August 4, 2011 between FRANCIS HIDALGO and another individual, HIDALGO provides "Benson's" address as 160th Street between Riverside Drive and Fort Washington Avenue, which is in the same location as the address — 652 West 160 Street, New York, New York — listed for SNELL in the Bronx Tool Repair Corp. contract adjustment document recovered from HIDALGO's residence; and (2) In a call on August 3, 2011, HIDALGO and an individual named Marisol Rossi discuss a party Rossi is hosting on August 6, 2011, which is three days after SNELL's fortieth birthday. Based upon a search of public records, I know that a particular address is listed as an address for both SNELL and Rossi. A review of the social networking website Mylife reveals that SNELL is listed as a close relative of Rossi's and that SNELL is 40 years' old. Moreover, in a call intercepted between HIDALGO and "Benson" on August 22, 2011 at approximately 10:35 a.m. "Benson" states "I'm over here in Marisol's house."

-10-

000008254

calls as "Benson," whom I believe to be VERNON SNELL,[2] regarding what I believe to be a rental payment for a location of a marijuana grow house and equipment and improvements needed to operate a marijuana grow house. The following paragraphs briefly describe some of these calls:

     i.   On August 4, 2011 at approximately 1:26 p.m., FRANCIS HIDALGO called a landlord for the Concord Avenue Warehouse and asked, in substance, whether HIDALGO's "partner" has called the landlord regarding the rent money. HIDALGO then tells the unknown individual that he, HIDALGO, is out of town and had left his partner the rent money and that he, HIDALGO, will call HIDALGO's partner to find out where he is with the rent money. Just one minute later, at 1:27 p.m., HIDALGO called "Benson" and told "Benson," in substance, and among other things,

---

[2] Among the reasons I believe that the individual referred to as "Benson" on the intercepted calls is VERNON SNELL are the following: (1) In a call on August 4, 2011 between FRANCIS HIDALGO and another individual, HIDALGO provides "Benson's" address as 160th Street between Riverside Drive and Fort Washington Avenue, which is in the same location as the address – 652 West 160 Street, New York, New York – listed for SNELL in the Bronx Tool Repair Corp. contract adjustment document recovered from HIDALGO's residence; and (2) In a call on August 3, 2011, HIDALGO and an individual named Marisol Rossi discuss a party Rossi is hosting on August 6, 2011, which is three days after SNELL's fortieth birthday. Based upon a search of public records, I know that a particular address is listed as an address for both SNELL and Rossi. A review of the social networking website Mylife reveals that SNELL is listed as a close relative of Rossi's and that SNELL is 40 years' old. Moreover, in a call intercepted between HIDALGO and "Benson" on August 22, 2011 at approximately 10:35 a.m. "Benson" states "I'm over here in Marisol's house."

-10-

000008254

that the dude for the rent called him.

ii. On August 23, 2011, at approximately 12:18 p.m., a call was intercepted between FRANCIS HIDALGO and "Benson," in which HIDALGO tells "Benson" about a "tank" with "two holes that come out, they go through a reservoir, that shoot out the water" and they "bend" and "kink," to which Benson replies "Well of course." During the same call, HIDALGO tells "Benson" that he "set up arrays of . . . the things we bought yesterday" and "sealed the door cause there was a lot of . . . things coming out through the door." "Benson" responds "Well, I guess, if I don't need one of the other little ones, I probably . . . need it for my other place . . ." Later in the call, HIDALGO states that "there's just one upstairs that looks stressed out"; "Benson" replies "Yeah . . . that one's been like that"; and HIDALGO replies "a big one." Based upon my knowledge and experience, I believe the foregoing conversation is regarding a Grow House operation.

iii. On August 22, 2011, FRANCIS HIDALGO and "Benson," have a series of calls during which the two discuss various supplies and equipment consistent with a Grow House operation. At approximately 10:35 a.m., "Benson" calls FRANCIS HIDALGO and asks HIDALGO to "stop by that place over there and get some filters," to which HIDALGO asks "the big ones?" and "Benson" replies "Yeah." During this call "Benson" states he wants "two"

-11-

000008255

filters and continues "And I need one too for my other place as well." At 2:29 p.m., HIDALGO calls "Benson" and the two briefly discuss fans, with HIDALGO stating to "Benson": "The thing you needed . . . the heads of the fans, is 8 inch heads." At 2:38 p.m., "Benson" called HIDALGO about the filters. During this call, "Benson" asks HIDALGO "You sure it's 8 inch right?"; HIDALGO asks "Benson" "How much are you getting them for?"; and "Benson" asks HIDALGO "Just the filter? Not the fan?" to which HIDALGO responds "not the fan." Based upon my knowledge and experience, fans and filters are needed for a Grow House operation.

18. A photograph taken of the area in front of the SUBJECT PREMISES on June 5, 2012, at approximately 3:12 p.m., depicts a man who appears to be walking away from the SUBJECT PREMISES ("Individual-2"). Based upon a comparison of the photograph of Individual-2 near the front of the SUBJECT PREMISES and a photograph contained in the criminal record of THOMAS MOTLEY, I believe that Individual-2 is MOTLEY. Based upon my review of an arrest report prepared by an officer of the Fort Lee, New Jersey, Police Department (the "Officer"), I know that MOTLEY was a passenger in a vehicle stopped by the Officer on August 8, 2008; the Officer smelled raw marijuana in the vehicle; the Officer recovered from the vehicle a greenish brown vegetation that appeared to be Marijuana; and the driver of the vehicle was an

-12-

000008256

individual named KAREEM BURKE.  Based upon my review of the
criminal record of BURKE and associated court records, I know
that: BURKE was charged in this district with conspiracy to
distribute marijuana, United States v. Manuel Geovanny Rodriguez-
Perez, et al., 10 Cr. 905 (LTS); the indictment charging BURKE
alleges, among other things, that BURKE "maintained a 'marijuana
grow house' at his residence in the vicinity of North Bergen, New
Jersey"; and, on March 15, 2012, BURKE pled guilty in this
district to conspiracy to distribute and possess with the intent
to distribute over 100 kilograms of marijuana.

19.  Based upon my review of video footage obtained from the
pole camera directed toward the front of the SUBJECT PREMISES, I
know that the SUBJECT PREMISES is generally visited for only
short periods.  Moreover, I have never observed the large roll up
gates in the front of the SUBJECT PREMISES opened.  Based upon my
knowledge, training, and experience, the pattern of the persons
who enter the SUBJECT PREMISES - i.e., intermittently and for
only short periods of time - is consistent with attributes of
Grow Houses.  I have also observed that the few individuals who
enter or exit the SUBJECT PREMISES do not place trash from the
SUBJECT PREMISES on the street for pick-up.

20.  Based upon my review of video footage obtained from a
pole camera directed toward the front of the SUBJECT PREMISES, I
know that the individuals I observed entering or exiting the

-13-

000008257

SUBJECT PREMISES frequently look around suspiciously before entering or exiting the SUBJECT PREMISES.

21. From my surveillance of the area of the SUBJECT PREMISES and my observations of the Concord Avenue Warehouse, I know that the SUBJECT PREMISES is approximately five blocks from the Concord Avenue Warehouse and that the two buildings appear nearly identical in their external construction.

22. Based upon my conversation with the Investigator, I know that, on June 15, 2012, the Investigator smelled a strong smell of incense in the immediate vicinity of the SUBJECT PREMISES. Based upon my knowledge and experience, I know that incense is frequently used to disguise or mask the odor of marijuana.

23. I have obtained records from Consolidated Edison, a utility provider, for the SUBJECT PREMISES. From my review of those records, and from my conversations with Con Edison representatives, I have learned the following:

a. A Consolidated Edison account for the SUBJECT PREMISES in the name DENIS PEREZ became effective on January 10, 2012. From January 10, 2012 to April 11, 2012, a period of approximately three months, the gas bill for the SUBJECT PREMISES was a total of $5,393.09, or an average of approximately $1797 per month.

b. By contrast, the gas bill for the previous

-14-

000008258

customer for the approximately one-month period from December 2, 2011 to January 10, 2012, was $386.77. Thus the monthly gas usage upon the opening of a new Consolidated Edison account for the SUBJECT PREMISES in January 2012 jumped more than four times with the change of account for the SUBJECT PREMISES.

24. Based on my training and experience, I know that Grow Houses generally require substantial quantities of gas or electricity to operate. Gas use that is more than four times the average for a similarly-sized location is consistent with the level of gas used by a Grow House.

25. Based on my training and experience, my personal participation in this and other investigations involving illegal drug activity, and conversations with other law enforcement officers who are knowledgeable of drug-trafficking investigations, I know that:

a. Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, money counters, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic

-15-

000008259

devices frequently are maintained in these locations on a continuing basis and for long periods. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

b. Drug traffickers routinely conceal in their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, or in this case, residences) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions. It is also common for drug traffickers to maintain at the same locations papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

c. It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers, microwave ovens, pots, dishes and other containers for preparing controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

d. Drug traffickers commonly maintain telephone number and address books, or papers which reflect names,

-16-

000008260

addresses and/or telephone numbers for other associates of their illegal organization, as well as telephone answering machines, electronic calendars and address/telephone devices. These individuals often utilize telephones, including cellular telephones, to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers, and electronic devices are often found in places used by drug traffickers to conduct their drug distribution activity;

     e.  Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

     f.  Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity;

     g.  Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record of deposits, withdrawal and transfer of funds and banks are

-17-

000008261

required to report cash transactions in excess of $10,000 to the Internal Revenue Service. Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting; and

h. Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment in their homes, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, mills, or safe houses and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory

-18-

000008262

setting.

## REQUEST TO SEARCH THE PREMISES
## AND ITEMS TO BE SEIZED

26. Based on the foregoing, my involvement in this investigation, and my training and experience, it is my belief that there is probable cause that the SUBJECT PREMISES has been and is continuing to be used to store instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 841 and 846, including, but not limited to, narcotics proceeds, and other items listed in ATTACHMENT A.

27. The evidence, fruits and instrumentalities of the offenses include the following:

a. Any and all controlled substances, including, but not limited to, marijuana and traces thereof, substances and mixtures containing marijuana, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

b. Papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

c. Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the

-19-

000008263

concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

d. United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, and precious metals and other valuables used to purchase controlled substances or equipment used to manufacture controlled substances, or which represent the proceeds of criminal activity;

e. Photographs, including still photographs, negatives, videotapes, film, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, assets and/or controlled dangerous substances;

f. Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

g. Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales, baggies and spoons;

h. Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

-20-

000008264

i. Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any records or receipts pertaining to firearms and ammunition;

j. Cellular telephones and pagers, as well as any information contained therein; and

k. Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and video storage devices.

28. If computers, computer hardware, software, related documentation, passwords, and/or data security devices are seized, the search procedure used to search these items for instrumentalities, evidence, and fruits of violations of Title 21, United States Code, Sections 841 and 846 is expected to include some or all of the following techniques:

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b. opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. scanning storage areas to discover and possibly recover recently deleted files;

d. scanning storage areas for deliberately hidden

-21-

000008265

files; and

      e.    performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

29.  In conducting the search of any, computers, computer hardware, software, related documentation, passwords, and/or data security devices described in this affidavit, the government shall make reasonable efforts to utilize computer search methodology to search only for files, documents, or other electronically stored information which are identified in the Search Warrant itself.

30.  Based on my training, experience, participation in other investigations concerning narcotics trafficking, and discussions with other law enforcement agents, I know that individuals who traffic narcotics routinely secrete and store books, records, documents, currency and other items of the sort described in ATTACHMENT A in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.  This warrant and this search procedure specifically include a search of any closed containers or cabinets, including doors to rooms within the SUBJECT PREMISES, locked or unlocked, found within the SUBJECT PREMISES.

-22-

000008266

31. This warrant and this search procedure specifically exclude a search of any kind of unopened electronic mail. No search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause.

32. In light of the confidential nature of the continuing investigation, the Government respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued, authorizing the search and seizure of the items listed in Attachment A, all of which constitute evidence of violations of Title 21, United States Code, Sections 841 and 846.

JAMES C. KRAUSE
Special Agent
Homeland Security Investigations

Sworn to before me this
19th day of June, 2012

THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-23-

000008267

**ATTACHMENT A**

Evidence to be seized from the premises known and described as 518 Timpson Place, Bronx, New York, 10455 and inside the locked and closed containers and closed items contained therein:

Instrumentalities, evidence, and fruits of violations of 21 U.S.C. §§ 841 and 846, including:

(a) Any and all controlled substances, including, but not limited to, marijuana, substances and mixtures containing marijuana, traces of marijuana, equipment used to package controlled substances, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

(b) Papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

(c) Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

(d) United States or foreign currency, negotiable instruments, stocks, bonds, jewelry, and precious metals and other valuables used to purchase controlled substances or equipment used to manufacture controlled substances, or which represent the proceeds of criminal activity;

(e) Photographs, including still photographs, negatives, videotapes, film, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, assets and/or controlled dangerous substances;

(f) Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

(g) Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales, baggies and spoons;

-i-

000008268